C. A. WHITE TRUCKING CO., INC. and A. F. CRANE and MARY L. CRANE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
C. A. White Trucking Co. v. Commissioner
Docket No. 7802-74.
United States Tax Court
T.C. Memo 1977-6; 1977 Tax Ct. Memo LEXIS 434; 36 T.C.M. (CCH) 19; T.C.M. (RIA) 770006; January 13, 1977, Filed M. Clifton Maxwell *435 and M. Ward Bailey, for the petitioners. John W. Dierker and Charles L. McReynolds, Jr., for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined a deficiency in the Federal income tax of petitioner C. A. White Trucking Co., Inc. in the amount of $14,194.19 for the calendar year 1970. Respondent determined a deficiency in the Federal income tax of petitioners A. F. Crane and Mary L. Crane in the amount of $102.50 for the calendar year 1970. The issue for decision with respect to petitioner C. A. White Trucking Co., Inc. is whether compensation paid by petitioner to its president and principal shareholder, A. F. Crane, is in excess of reasonable compensation for services, and, if so, what amount is properly deductible under section 162(a)(1), I.R.C. 1954, [1] as reasonable compensation for the services rendered by Mr. Crane.
The issues for decision with respect to petitioners A. F. Crane and Mary L. Crane are: (1) Whether petitioners received additional income *436 of $300 representing the fair market value of personal use of an automobile furnished Mr. Crane by C. A. White Trucking Co., Inc.; and (2) whether petitioners are entitled to a deduction of $117 representing the portion of the expenses of maintaining their personal residence that is allocable to a part of the den used as an office. [2]
FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly.
C. A. White Trucking Co., Inc. (White Trucking) is a corporation with its principal place of business in Dallas, Texas at the time of the filing of the petition in this case.White Trucking filed its *437 Federal corporate income tax return for the calendar year 1970 with the Internal Revenue Service Center at Austin, Texas. A. F. and Mary L. Crane, husband and wife, who resided in Dallas, Texas at the time of the filing of their petition in this case, filed a joint Federal income tax return for the calendar year 1970 with the Internal Revenue Service Center at Austin, Texas. During the year 1970 Mr. Crane was the chief executive officer of White Trucking and petitioners owned approximately 55 percent of that corporation's outstanding stock. Mr. Crane has been president and general manager of White Trucking since 1962 when he acquired his stock in that corporation. Mr. Crane has been working in the trucking industry in excess of 35 years.Mr. Crane began acquiring experience and knowledge of the trucking industry shortly after finishing high school when he was employed by an oil field construction firm. [3] In connection with his work with that firm, Mr. Crane learned some of the accounting aspects of the trucking business and became familiar with some of the problems of that business. When the rental derrick business became unprofitable because of advances in technology, he *438 went to work for an oil field hauler. There he served as a traffic manager and gained experience in such areas as billing, dispatching, Interstate Commerce Commission accounting systems, tariffs, and interlining arrangements. In 1944 Mr. Crane acquired ownership in a trucking company by purchasing 20 percent of the stock of a company which was in a shaky financial situation. He served in the capacity of vice president and general manager of that company. As vice president and general manager, he was responsible for all sales, insurance damage claims, employee relations, supervision of rate men, accounting, billing and relations with regulatory authorities. He worked for the company for 11 years and transformed the business into a profitable one. His position with the company was terminated because of his disagreement with the majority shareholder in the company with respect to his recommendation of a salary increase for a salesman. At that time Mr. Crane decided that his goal was to *439 one day own his own trucking company. From 1954 to 1957 Mr. Crane was vice president in charge of sales for a Texas trucking company. In that position he was responsible for all sales activities of the company including supervision of one other salesman. In 1957 Mr. Crane changed to another trucking concern where he was also vice president in charge of sales. From that date until his acquisition of stock of White Trucking in 1962, he was responsible for all activities of the company with respect to sales and the supervision of another salesman. In addition, he represented the company before the Interstate Commerce Commission (ICC) and the Texas Railroad Commission, which had intrastate authority over the trucking industry in Texas.
In 1962 Mr. Crane was informed that C. A. White Trucking Company of Seminole, Oklahoma was for sale. This company was dormant, but possessed interstate operating authority. After learning that White Trucking was for sale, Mr. Crane contacted Lloyd Moore, president of Moore Brothers Construction Company, because he understood that that company was interested in disposing of its Texas intrastate certificate. Mr. Moore and Mr. Crane agreed that Mr. *440 Moore would provide $5,000 cash plus the intrastate permit and in turn would receive a portion of the stock of White Trucking. Mr. Crane borrowed $5,000 from his mother to invest in stock of White Trucking. In addition he used $10,000 of funds he held jointly with his wife plus $7,500 of his wife's separate property to invest in the stock of White Trucking. Mr. Claude Craig invested $2,500 in stock of White Trucking and agreed to lease four trucks to the business. In return for their $22,500 investment, Mr. Crane and Mrs. Crane received 54.5 percent of the outstanding stock of White Trucking, Mr. Moore received 39.5 percent of White Trucking stock for his $5,000 investment and the intrastate permit and Mr. Craig 6.5 percent for his $2,500 investment. Mr. Crane was elected president and Mr. Moore vice president of the company. The company opened for business on June 2, 1962. White Trucking operates as an irregular route specialized common carrier and is thus limited as to the geographical areas it may serve and the commodities it may carry. The company provides call and demand service. The geographical areas of operation of White Trucking and the commodities that it may haul *441 are governed on an interstate basis by the ICC and on an intrastate basis by the Texas Railroad Commission. At the time Messrs. Crane, Moore and Craig acquired the stock of White Trucking the corporation was dormant but it did possess an operating certificate that granted it authority to transport certain commodities to certain areas. After Mr. Crane acquired his stock interest in White Trucking, it became a successful business with gross revenues increasing each year [4] as follows: Year Ending
6/30/63
$188,762
6/30/64
219,669
6/30/65
296,245
6/30/66
299,291
6/30/67
350,527
7/1-12/31/67
198,756
12/31/68
455,661
12/31/69
535,940
12/31/70
786,602
The increase in volume of business of White Trucking has been primarily due to the efforts of Mr. Crane. He has been very active in the acquisition of both interstate and intrastate additional operating authority for the company. Acquisition of additional operating authority has allowed the company to expand in the geographical areas it serves and the commodities and goods it transports. Mr. Crane *442 has also been personally responsible for acquiring a number of additional customers for White Trucking. During 1970 Mr. Crane performed all executive functions for White Trucking. He had sole authority over business decisions including personnel, acquisition of new customers and various transportation arrangements with other common carriers. Some of the interchange arrangements he has worked out with other carriers have been the source of much of the increased revenue of White Trucking. Mr. Crane's duties included performing the function of president and general manager, salesman, and traffic manager. Mr. Crane performed all the rate work for White Trucking. In order to properly determine rates, Mr. Crane was required to fully understand the approximately eight different tariff schedules applicable to the different commodities that White Trucking had the authority to transport. In connection with the rate work, Mr. Crane did all of the billing for the company. He also did much of the dispatching of the trucks.As traffic manager, his duties included attending hearings conducted by the ICC and the Texas Railroad Commission to obtain additional operating authority for the company. *443 Mr. Crane was also responsible for submitting bids on behalf of White Trucking for contracts on local hauls. These agreements are not subject to the rate structures of the ICC or the Texas Railroad Commission, but are obtained on a competitive basis. In 1970 such bids were made approximately every other day in the Houston area. Mr. Crane also did accounting work of the company and prepared various tax returns which the company was required to file including fuel tax reports required by each state in which White Trucking operated. The accounting system used by the company to comply with the reporting requirements of the regulatory agencies was developed by Mr. Crane. An individual employed by White Trucking in the capacity of bookkeeper had done much of the work of preparing various tax reports in prior years. However, this individual had become ill during the latter part of 1969 and was never able to return to work. No one was hired to replace this bookkeeper, but Mrs. Crane did much of the work the bookkeeper had been doing. Mr. Crane was also responsible for safety work for White Trucking. He had to be sure the trucks operated by White Trucking met the qualification requirements *444 of the various states as to equipment and safety features. Mr. Crane also obtained operating permits in instances where a deviation from normal weight or size limits was necessary. Mr. Crane worked an average of 65 to 70 hours per week. He was often away from home due to business requirements and during 1970 was out of town on business a total of 7 weekends and a total of 44 nights. Mrs. Crane was also very instrumental in the growth of White Trucking. She was office manager of the company and during 1970 worked approximately 50 hours per week in discharging her duties. Mrs. Crane was responsible for taking telephone orders requesting services, posting accounts receivable and payable to the books, and occasionally acting as a dispatcher for the Dallas terminal. She was in charge of the company when her husband was out of town on business. In addition to her duties as office manager, Mrs. Crane also prepared a profit and loss statement of the company twice a month and was responsible for preparing the payroll and making required reports relative to the payroll. In 1970, Mrs. Crane prepared for White Trucking a report of Gross Ton Mileage for the State of Colorado, required *445 reports to the ICC and the State of Arkansas, and a report to McAlister Trucking Company with respect to an interlining arrangement between that company and White Trucking. In prior years many of these reports had been prepared by the bookkeeper who was not able to work in 1970. The other shareholders did not serve as employees in the main office of White Trucking. Mr. Lloyd Moore, a shareholder and member of the board of directors of White Trucking, was not directly involved in the operation of the business and no board meeting was held in 1970. Although he had received a salary in prior years, Mr. Moore was paid no salary in 1970, but he did receive rental fees for leasing a terminal facility to the company at Lufkin, Texas. Mr. Claude Craig received a salary from White Trucking in the amount of $13,135 for serving as terminal manager of the terminal maintained at Lone Star Steel Company, one of White Trucking's best customers. In addition he received approximately $87,000 in leasing fees for the four trucks he furnished to the company. The only additional employees, other than drivers, of White Trucking were a part-time secretary who worked a half day approximately every *446 other day, an individual hired in December 1970 to be trained to do rate work, and a trainee hired during the middle of the year, but who was terminated shortly after being employed. The company employed an average of 19 drivers of leased trucks. In most cases the driver owned the truck that he drove. In some instances a driver was furnished with the truck by the lessor. The driver is paid a salary separate from the truck rental payment. Deductions for Federal income tax, Workman's Compensation, and Social Security are made for the salary payments to the truck drivers. The revenue generated by the operation of the leased trucks is customarily split 30 percent to White Trucking, 20 percent to the driver, and 50 percent to the lessor of the truck. The lessor is responsible for gasoline and maintenance of the truck, while White Trucking maintains liability insurance on the leased trucks. During 1970, all of the vehicles operated by White Trucking were leased trucks. During 1970 there was a substantial increase in the revenue and business activity of White Trucking. An interline arrangement had been established with McAlister Trucking Company in the latter part of 1969 that proved *447 to be a very valuable addition to the business of White Trucking. At the time this agreement was being negotiated, Mr. Crane anticipated that there would be only a few loads per month transported under the agreement. However, there was a much heavier demand for the service than Mr. Crane expected so that the agreement accounted for approximately 50 percent of the gross revenue of White Trucking in 1970. Mr. Crane had located a customer that required the transportation of standard pipe or merchant pipe, which is used in buildings for plumbing purposes. The locations to which the customer wanted the pipe hauled were beyond the area of the operating authority of White Trucking so that an interline arrangement was reached with McAlister Trucking Company to permit transportation by White Trucking of the pipe into areas where it did not have operating authority. The agreement allowed White Trucking to transport pipe into areas in which McAlister Trucking Company possessed the requisite operating authority. Under such an arrangement the revenues are shared by the two companies. Prior to the acquisition of the customer requiring transportation of standard pipe, the majority of the material *448 transported by White Trucking had been oil field pipe and various oil field commodities. In 1970, White Trucking through the efforts of Mr. Crane obtained terminal facilities in the Houston area. Mr. Crane was also responsible for obtaining additional operating authority under the ICC certificate of White Trucking to allow non-oil field tubing to be transported from Gainesville, Texas to points in Arkansas, Louisiana, Missouri, Oklahoma and Texas. Also, in 1970, Mr. Crane obtained for White Trucking additional operating authority from the Texas Railroad Commission allowing the transportation of iron and steel articles, including bundled pipe, between all points in Texas. Mr. Crane attempted to obtain ICC approval to transport goods for the Department of Defense, but this proposal met with resistance and the approval was not obtained. The obtaining of amendments to White Trucking's certificates of operating authority required a great amount of Mr. Crane's time in the year 1970.
In 1970 Mr. Crane also considered acquiring a truck line in Houston, but after several days of investigation decided not to expand the business of White Trucking in this manner. During most of 1970 *449 Mr. Crane received a salary of $225 per week. In the middle of November this amount was increased to $250 per week. On approximately December 31, 1970, Mr. Crane received a bonus, through the issuance of several checks drawn on White Trucking accounts, totaling approximately $65,000 so that for 1970 he received a total of $76,850. This amount was deducted by White Trucking on its Federal corporate income tax return as a business expense for compensation paid to Mr. Crane. The amount of the bonus was determined by Mr. Crane and Mrs. Crane in December 1970. White Trucking did not have a board of directors meeting in 1970, but subsequently at a board meeting the bonus paid to Mr. Crane for 1970 was ratified. Mr. Moore was not aware that a bonus had been paid to Mr. Crane in 1970 until he received a copy of the year-end report. During the year 1970 Mr. Crane did not have a contractual arrangement with White Trucking with respect to the amount of his compensation. It had been the prior oral understanding of the stockholders of White Trucking, reached shortly after the purchase of the stock of the company in 1962, that Mr. Crane would be paid a nominal salary until such time *450 as the company could afford to pay him more, based upon the contingency that Mr. Crane had produced adequate results for the company. In reaching their determination of the amount of bonus to be paid to Mr. Crane, the Cranes listed the duties that Mr. Crane had performed for White Trucking during the year. The functions and amounts determined were as follows: Function
Amount
President and general manager
$40,000
Sales manager
20,000
Traffic manager
16,850
$76,850
After a determination of what amount the Cranes felt Mr. Crane's services were worth to the company and what amount the company could afford to pay, the bonus of approximately $65,000 was paid to make up the difference between the amount of salary received during prior months in 1970 and the determination of the $76,850 salary. One factor used in this determination by the Cranes was what amount would have to be paid by White Trucking to hire other individuals to perform the functions that Mr. Crane had performed for the business, if for some reason Mr. Crane had become unable to work. Mr. Crane was also aware that the payment of increased compensation as distinguished from a dividend payment *451 would reduce the amount of the Federal corporate income tax of White Trucking. The method of determination of Mr. Crane's bonus used in 1970 has not been used in subsequent years. In prior years the Cranes had not used this method to determine an amount of Mr. Crane's bonus. In those years they had made a determination based on their opinion of what the company could pay under the circumstances and also on the amount Mr. Crane felt he had been worth to the company. During the year 1970, Mr. Crane devoted approximately 25 percent of his time to duties of a president and general manager, 35 percent of his time to sales work and 40 percent of his time to duties of a traffic manager, which included such functions as dispatching, rate work, and obtaining permits from the ICC and the Texas Railroad Commission. In the year 1970 White Trucking paid no dividends although it had adequate surplus to do so.White Trucking did not provide its officers with fringe benefits such as a pension or a profit sharing plan, group life insurance, or medical benefits. Mr. Crane did not take a vacation during 1970. During 1970 Mrs. Crane was paid a salary of $4,000 although in 1969 she had received *452 a salary of $14,100.In 1970 her job was more demanding than in the prior year because she was required to perform some of the functions that had been assumed in the past by the bookkeeper.
For the years prior to 1970 the compensation received by the Cranes from White Trucking was as follows: Year Ended
Mr. Crane
Mrs. Crane
6/30/66
$18,466
$ 6,850
6/30/67
23,100
10,100
7/1-12/31/67
11,450
5,050
12/31/68
27,400
10,850
12/31/69
35,600
14,100
During 1970 Mr. Crane commuted to and from work in an automobile owned by White Trucking. Mrs. Crane used the Cranes' personal car to commute to and from the office. The suite of two offices of White Trucking was located on the third floor of a commercial office building. There was no inside parking available at the office for the automobile owned by the company. The automobile owned by White Trucking was not used by the Cranes for personal purposes other than Mr. Crane's commuting. The Cranes used one-half of the den in their home for the purpose of performing work for White Trucking. The den had a detached telephone extension of White Trucking so that if the phone was not answered at the corporation's *453 office it could be answered at the Cranes' home. After hours business calls were received on the White Trucking detached extension on an average of four or five times per week. The Cranes often had to resolve problems with respect to dispatching, truck breakdowns and bad weather outside of regular business hours of White Trucking and customers of White Trucking would occasionally call at times other than the regular office hours of the corporation. In addition to taking telephone calls for White Trucking on the telephone located in their den, the Cranes used a portion of the den to work on business-related matters of White Trucking such as the checking of logs, preparation of expense accounts, making travel arrangements and reading professional literature an average of once per week. The expenses allocable to the portion of their home used by the Cranes in connection with the business of White Trucking were $117 for 1970. [5]
*454 Respondent, by separate statutory notices, made the following determinations with respect to petitioner White Trucking and petitioners A. F. Crane and Mary L. Crane. The statutory notice of deficiency mailed to C.A. White Trucking Company, Inc. made the following determination with respect to its 1970 Federal corporate income tax: It is determined that the claimed compensation to Frank Crane of $76,850.00 during the taxable year 1970 is excessive in the amount of $28,850.00. Such amount exceeds a reasonable allowance for salaries or other compensation for personal services actually rendered within the ambit of Section 162 of the Internal Revenue Code. The statutory notice of deficiency mailed to petitioners A.F. and Mary L. Crane made the following determination with respect to their 1970 Federal income tax: (a) It is determined that the fair market rental value of the automobile furnished to you by C.A. White Trucking Co., Inc. is taxable as income to you in the amount of $300.00. (c) It is determined that you received dividend income of $28,850.00 from C.A. White Trucking Co., Inc. instead of salary income as reported therefore, a dividend exclusion *455 of $200.00, not claimed, is allowable. The Cranes did not claim a deduction on their Federal income tax return for the calendar 1970 for use of a portion of their home for a business office, but in an amended petition alleged that they were entitled to such a deduction. OPINION Section 162 and the regulations thereunder [6] provide for a deduction by a taxpayer of ordinary and necessary expenses paid during the taxable year in carrying on its trade or business including a reasonable allowance for salaries or other compensation for personal services actually rendered. *456 Whether the amount of $76,850 paid by White Trucking during 1970 to its principal officer, A.F. Crane, represents reasonable compensation for services actually rendered is "a question of fact to be determined on the basis of the particular circumstances in each case." Pepsi-Cola Bottling Co. of Salina, Inc.,61 T.C. 564, 567 (1974), affirmed 528 F. 2d 176 (10th Cir. 1975); Dielectric Materials Co.,57 T.C. 587, 591 (1972). This determination of fact is to be made by a consideration not only of the nature of the corporate business, but also the nature of the services rendered by the officer. Botany Worsted Mills v. United States,278 U.S. 282 (1929). The factors to be considered in reaching such a determination have been outlined in a number of cases. We have often cited the criteria to be considered in making this determination as set forth in Mayson Mfg. Co. v. Commissioner,178 F.2d 115, 119 (6th Cir. 1949), reversing a Memorandum Opinion of this Court. That case set forth the basic factors to be considered *457 in reaching the decision in such a case as the employee's qualifications; the nature, extent and scope of the employee's work; the size and complexities of the business; a comparison of salaries paid with the gross income and the net income; the prevailing general economic conditions; comparison of salaries with distributions to stockholders; the prevailing rates of compensation for comparable positions in comparable concerns; the salary policy of the taxpayer as to all employees; and in the case of small corporations with a limited number of officers the amount of compensation paid to the particular employee in previous years. * * * It is petitioner's position that the salary and bonus paid to Mr. Crane was reasonable in amount. Petitioner argues that Mr. Crane did all the work for White Trucking which was done for other trucking concerns by several individuals working on a full-time basis and that this factor was taken into consideration in a determination of Mr. Crane's bonus. Petitioner argues that it would have been required to hire several individuals to perform the duties performed by Mr. Crane, if for some reason Mr. Crane had been no longer able to work. Petitioner *458 points out that Mr. Crane has had a number of years experience in the trucking industry and related fields and that his services have transformed White Trucking from a dormant to a successful business operation. Petitioner also points to the fact that White Trucking provided no fringe benefits to its employees while many employers customarily provide such benefits. It is respondent's position that the salary and bonus received by Mr. Crane were not negotiated at arm's length with White Trucking. He states that Mr. Crane exercised majority control of the corporation and there was no approval of Mr. Crane's 1970 bonus by members of the board of White Trucking, other than the Cranes, during 1970. Respondent also argues that Mr. Crane's compensation was keyed to profitability of the company and not to the compensation customarily paid for a person in a comparable situation to that of Mr. Crane. It is respondent's position that a reasonable amount of compensation for 1970 for Mr. Crane is $48,000. Respondent relies on a valuation report prepared by his expert witness, who reached the conclusion that $48,000 was reasonable compensation for the services rendered by Mr. Crane to White *459 Trucking during the year 1970. The conclusion reached by respondent's expert witness was based primarily upon an examination of statistics compiled from data included in corporate income tax returns for periods ended July 1970 to June 1971 with respect to other corporations in the trucking and warehousing industry. The data used by the witness is contained in the Internal Revenue Service's annual publication, Source Book, Statistics of Income. In general, the focus of the witness' study was a comparison of the compensation paid by other trucking businesses to officers to the business receipts of the business.The various corporations considered by the witness were grouped according to size, as stated in terms of total assets.The comparisons made by respondent's expert witness [7] *461 show in general that the compensation of officers of White Trucking in 1970 was a much greater percentage of operating revenue than was the compensation paid by other corporations in the same field to officers in 1970. *460 Petitioner makes an alternative argument that if we conclude *462 that the compensation paid by White Trucking to Mr. Crane was excessive, the corporation should be entitled to deduct this excessive amount as compensation of Mrs. Crane because the reasonable value of her services to the corporation was greater than $4,000. Petitioner offers several theories in support of this position. Petitioner argues that because Texas is a community property state, the reasonableness of compensation for the services of a husband and wife should be on the basis of the services rendered by the marital unit. Petitioner contends that a payment to Mr. Crane for the worth of services rendered by Mrs. Crane should be deductible by White Trucking in the same manner as if the amount had been paid directly to Mrs. Crane since the husband is the trustee for the wife under the community property laws of Texas. Petitioner's argument is without merit. There is nothing in this record to show that Mr. Crane received payment for any services rendered to White Trucking by Mrs. Crane.
Under Texas law, if personal earnings of one spouse are mixed or combined with the community *463 property of the other spouse then such mixed or combined community property is subject to the joint management, control, and disposition of the spouses. [9] Mrs. Crane's personal earnings under Texas law are subject to her control unless they are mixed or combined with community property subject to her husband's control. However, there is nothing in this record to show that Mrs. Crane had any personal earnings in 1970 which were combined with community property subject to her husband's control or that he had any earnings which were combined with community property subject to her control. The fact that Mrs. Crane rendered services to an employer does not entitle her to compensation other than in the amount agreed upon between her and her employer. Her services are not community property, but only the pay she receives for her services. Amounts paid to Mr. Crane purportedly for his services cannot be converted to amounts paid to Mrs. Crane because of any community property law. *464 Petitioner also argues that Mr. Crane and Mrs. Crane have always worked as a team in the operation of White Trucking from the beginning of the business. It is petitioner's argument that in the determination of whether the amount paid in 1970 by White Trucking was reasonable compensation, we should look to the services provided by both husband and wife and the total amount of the compensation of the two of them. Petitioner states on brief that "[when] the $65,000 bonus was determined for Frank in 1970 to increase his compensation to $76,850 there was no consideration given to adjusting Mary's compensation of $4,000, although she was certainly worth more than $4,000 to the company * * *." The evidence of record supports this statement. Petitioner intended to pay the bonus as compensation for personal services of Mr. Crane rendered to the company, not for the services provided by Mrs. Crane, even though her services were substantial. The record is clear that White Trucking paid no amount to Mrs. Crane or for the services of Mrs. Crane in 1970 in excess of the $4,000 even though her services to the company in that year may have had a value in excess of $4,000. [10]
*465 Petitioner cites Lewisville Investment Co.,56 T.C. 770 (1971), in support of its position. That case involved a joint venture in which the management consisted of the two Clement brothers as the "Clement Unit" and three Ball brothers as the "Ball Unit," and third party investors. The agreement provided for compensation to be paid to the Clements as a unit and the Balls as a unit for their services based upon 10 percent of the profits of the joint venture determined prior to the payment of income tax. The brothers of each unit agreed to share the unit's portion of compensation on an equal basis. Later the assets of the joint venture were transferred into several corporations which ratified the compensation agreement of the joint venture. The individual Clement brothers and Ball brothers performed various functions, but their compensation continued on a unit basis. Respondent disallowed a deduction to the corporation for amounts received by certain individuals within the respective units on the basis that such individuals' salaries were unreasonable in light of the actual services rendered by each respective individual. We analogized the agreement of the parties *466 to a joint venture providing management services on a commission basis, and concluded in "the light of the unique facts here present" that the compensation paid to each the Clement Unit and the Ball Unit for the services actually rendered by each unit as a whole was reasonable. In our view the holding of the LewisvilleInvestment Co. case, supra, is not applicable to the instant case. In the instant case there is no indication from the evidence that the Cranes reached any agreement with the corporation to provide services as a unit. In fact, the evidence here is clear that there was no such "unit" agreement. Compensation was paid to Mr. Crane based upon a determination of the value of his services to the corporation without a determination of the appropriateness of the salary of Mrs. Crane. Mr. Crane's compensation was not paid as a portion of a husband and wife "unit." It is also clear that Mrs. Crane was paid in her individual capacity of an employee. The record indicates that she may have been underpaid for the services she rendered to the corporation. However, there is no basis in this record to permit the corporation to deduct a payment in excess of reasonable *467 compensation to Mr. Crane because Mrs. Crane may have been underpaid. During 1970, Mr. Crane was furnished an automobile by the corporation which he used for transportation between his personal residence and the office of White Trucking. Respondent determined that the fair market value of the use of the automobile for commuting purposes was $25 per month or a total of $300 for the year. Petitioner has offered no evidence to show that the value of the use of the automobile by Mr. Crane for commuting was other than $300. It is the position of Mr. Crane that the business purposes for which the automobile was furnished to him by White Trucking included transportation to and from work. On the basis of this position, Mr. Crane concludes that such use of the automobile was not a personal use. Mr. Crane argues that driving the car home at night from the office was for the benefit of the corporation. In our view, the fact that the corporation permitted Mr. Crane to use the automobile for commuting does not turn Mr. Crane's personal expense of commuting into a business expense. Mr. Crane testified that he was required to take the automobile home because the corporation did not have *468 available a safe place to park it overnight. However, the record does not establish that the safety afforded for the car at Mr. Crane's personal residence exceeded that at the corporation's business premises so as to justify Mr. Crane's driving the car to his home as a business expense. Mr. Crane also contends that he was on 24-hour call and was often required to return to the office at night, either because of emergencies or to complete routine work. Mr. Crane also argues that since he did work for White Trucking at home, driving from the offices of White Trucking to his home was merely driving from one place of business to another. It is petitioners' position that because of all these reasons the use of the automobile by Mr. Crane to drive to and from the offices of White Trucking was in furtherance of the corporation's business and was not a personal use by Mr. Crane of the automobile.
Expenses incurred by a taxpayer in traveling to and from his residence and regular place of employment are commuting expenses which are personal in nature even though the taxpayer may be on round-the-clock *469 call for work. Sec. 1.162-2(e), Income Tax Regs:, Lenke Marot,36 T.C. 238 (1961). The use by Mr. Crane of the automobile furnished to him by White Trucking to commute to and from work was a personal use of the automobile. There is insufficient evidence in this record to show that any corporate purpose was served by the furnishing of commuting transportation to Mr. Crane. The fact that Mr. Crane sometimes had to return to work at night for either routine or emergency reasons does not change the personal nature of his use of the automobile for commuting. Margaret Galotta Sheldon,50 T.C. 24 (1968); Clarence J. Sapp,36 T.C. 852 (1961), affd. per curiam 309 F.2d 143 (5th Cir. 1962). Where a taxpayer is furnished personal use of corporate property, the fair market value of such use is income to him. See International Artists, Ltd.,55 T.C. 94 (1970). We, therefore, sustain respondent's determination with respect to the inclusion in the income of the Cranes of the fair market value of Mr. Crane's personal use of the automobile furnished him by White Trucking. During 1970, *470 Mr. and Mrs. Crane occasionally used one-half of the den at their personal residence for work related to the business of White Trucking. This area of the den was used to check drivers' logs, prepare expense accounts, make travel arrangements, and read professional literature. In addition, the corporation had installed a detached telephone extension in the Cranes' home which had been placed in this room. The office phone of White Trucking could be answered by Mr. and Mrs. Crane at their home when no one was at the office. This extension was used by Mr. and Mrs. Crane to dispatch trucks and resolve other problems of White Trucking such as truck breakdowns, that might require handling during other than normal business hours.The parties have stipulated that the portion of total expenses incurred during the year 1970 in maintenance of the personal residence of Mr. and Mrs. Crane allocable to the one-half of the den used for work connected with White Trucking was $117. It is petitioners' position that the maintenance of an office in the personal residence of Mr. and Mrs. Crane was a "helpful, appropriate and usual business expenditure" because of the duties the Cranes were required *471 to perform for White Trucking. For this reason petitioners contend that the Cranes are entitled to a deduction of the $117 cost of maintaining an office in their home as a business expense. [11]
It is respondent's position that petitioners are not entitled to a deduction as a business expense for the amount of the expense of maintaining their home attributable to the portion of the den used in connection with the business of White Trucking.Respondent points out that White Trucking maintained an office at its business premises which was available for business use by the Cranes at all times. He states that the Cranes chose for reasons of their own personal convenience to use a portion of their residence to perform the work of White Trucking. Respondent argues that this expense is a nondeductible personal expense within the meaning *472 of section 262 rather than a business expense deductible under section 162.
Section 1.262-1(b) (3), Income Tax Regs., provides: (3) Expenses of maintaining a household, including amounts paid for rent, water, utilities, domestic service, and the like, are not deductible. A taxpayer who rents a property for residential purposes, but incidentally conducts business there (his place of business being elsewhere) shall not deduct any part of the rent. If, however, he uses part of the house as his place of business, such portion of the rent and other similar expenses as is properly attributable to such place of business is deductible as a business expense. In our recent decision of Joel A. Sharon,66 T.C. 515, 523 (1976), we held that the incidental use by a taxpayer of part of his personal residence for work related to his employment was insufficient to take a part of the expenses incurred in maintaining his personal residence out of the nondeductible category of section 262. We held that such a use of a part of a personal residence did not establish *473 that a portion of a taxpayer's residence constitutes a place of business.In the case before us, it is apparent that petitioners had a readily accessible office on the business premises of White Trucking at which they could have performed such tasks as checking drivers' logs, preparing expense accounts, making travel arrangements, and reading literature of the trucking profession. However, petitioners chose to perform these tasks in connection with their employment at their home purely as a matter of personal convenience, comfort, or economy. Such use of a part of a home is merely incidental business use and does not constitute a place of business. Because of the nature of the trucking business White Trucking maintained a detached telephone extension in the den of the Cranes' home. It was convenient to have such an extension because of the problems that might arise in the business of White Trucking at any time of the day. Problems requiring use of the extension telephone did arise in the business of White Trucking on an average of four to five times per week. The expense of the extension *474 telephone was borne by White Trucking. There is clear evidence that the Cranes did not personally incur any additional expense by reason of the extension being located in their home. It is also clear that the Cranes did not set aside the portion of their den which they contend constituted a business "home office" merely because the extension telephone was placed at that particular location. The business use of a portion of the Cranes' den is claimed because of all the various tasks performed at their residence.The facts before us fall within our decision in Joel A. Sharon,supra.[12] We therefore hold that the Cranes are not entitled to deduct any portion of the cost of maintaining their home because of use of a part of their den for work related to the business of White Trucking.
*475 Decision will be entered under Rule 155. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.↩
2. In their joint return for 1970 petitioners deducted $468.78 as a casualty loss. In the notice of deficiency respondent disallowed $100 of the claimed casualty loss pursuant to sec. 165(c)(3). Although petitioners alleged in their petition that respondent erred in reducing the claimed deduction by such amount, petitioners offered no evidence nor made any argument with respect to the disallowance. Therefore, apparently petitioners have abandoned their position with respect to respondent's disallowance of a portion of the claimed causalty loss being erroneous.↩
3. During a period of 21 years after graduating from high school, Mr. Crane attended college at night when his work permitted, receiving his B.S. degree at the end of the 21-year period.↩
4. The income tax return of White Trucking for 1970 reflected a total asset value of $251,617.65.↩
5. This amount was stipulated by the parties. The amount was determined by multiplying the total expense of maintaining the Cranes' personal residence by the ratio that the square footage that one-half of the den bore to the total square footage of the Cranes' residence.↩
6. SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General.--There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including-- (1) a reasonable allowance for salaries or other compensation for personal services actually rendered; Sec. 1.162-7 [Income Tax Regs.]. Compensation for personal services. (a) There may be included among the ordinary and necessary expenses paid or incurred in carrying on any trade or business a reasonable allowance for salaries or other compensation for personal services actually rendered. The test of deductibility in the case of compensation payments is whether they are reasonable and are in fact payments purely for services. (b)The test set forth in paragraph (a) of this section and its practical application may be further stated and illustrated as follows: (1) Any amount paid in the form of compensation, but not in fact as the purchase price of services, is not deductible. An ostensible salary paid by a corporation may be a distribution of a dividend on stock. This is likely to occur in the case of a corporation having few shareholders, practically all of whom draw salaries. If in such a case the salaries are in excess of those ordinarily paid for similar services and the excessive payments correspond or bear a close relationship to the stockholdings of the officers or employees, it would seem likely that the salaries are not paid wholly for services rendered, but that the excessive payments are a distribution of earnings upon the stock. * * * (2) The form or method of fixing compensation is not decisive as to deductibility. While any form of contingent compensation invites scrutiny as a possible distribution of earnings of the enterprise, it does not follow that payments on a contingent basis are to be treated fundamentally on any basis different from that applying to compensation at a flat rate. Generally speaking, if contingent compensation is paid pursuant to a free bargain between the employer and the individual made before the services are rendered, not influenced by any consideration on the part of the employer other than that of securing on fair and advantageous terms the services of the individual, it should be allowed as a deduction even though in the actual working out of the contract it may prove to be greater than the amount which would ordinarily be paid. (3) In any event the allowance for the compensation paid may not exceed what is reasonable under all the circumstances. It is, in general, just to assume that reasonable and true compensation is only such amount as would ordinarily be paid for like services by like enterprises under like circumstances. The circumstances to be taken into consideration are those existing at the date when the contract for services was made, not those existing at the date when the contract is questioned.↩
7. The statistics used by respondent's expert witness show the following: Officers
Average
Compensation
Average
Compensation
As Percent Size of Total Assets
Number
Business
Of Officers
Of Business (in thousands)
Of Returns
Receipts
Per Return
Receipts
$ 100 under 250
4,128
$ 366,656
$20,541
5.60%
250 under 500
2,086
702,021
32,618
4.65%
500 under 1,000
1,109
1,308,627
45,821
3.50%
1,000 under 5,000
889
3,315,570
70,466
2.13%
5,000 under 10,000
69
14,425,116
144,232
1.00%
10,000 under 25,000
54
29,927,500
233,407
.78%
25,000 under 50,000
9
52,318,111
273,778
.52%
50,000 under 100,000
14
79,359,000
544,929
.69%
100,000 under 250,000
5
116,877,000
488,600
.42%
C. A. WHITE TRUCKING COMPANY, INC.
$251,618
1
786,602
- The amount of $93,985 as a total of compensation paid to the officers of White Trucking was determined by adding the amounts paid to A. F. Crane, Mary L. Crane, and Claude Craig. These amounts were $76,850, $4,000, and $13,135, respectively. C.A. White
1970
Trucking Company, Inc.
Source Book Statistics
Size of Total Assets
100
250
under
under
250
500
Number of Returns
1
4,128
2,086
Average of Total Assets
$251,681
$169,000
$355,000
Average Business Receipts
$786,602
$366,656
$702,021
Average Compensation for
All Officers Per Return
$ 93,985
$ 20,541
$ 32,618
Officers' Compensation to
Business Receipts
11.95%
5.60%
4.65%
Respondent's witness also made comparisons of the officers' compensation paid by White Trucking to that paid by other companies which hauled the same types of commodities hauled by White Trucking and other companies comparable in size, geographic location and stock ownership to White Trucking. These comparisons revealed approximately the same results as the comparison made with the approximately 8,100 companies engaged in the trucking and warehousing business listed in Statistics of Income. The witness concluded that comparable compensation for a chief executive officer for a company the size and nature of White Trucking would be in a range of $36,000 to $48,000 for 1970. The witness determined that because of the lack of fringe benefits provided by White Trucking and the fact that Mr. Crane had little supervisory help, a reasonable amount of compensation for the work Mr. Crane did for White Trucking during 1970 would be $48,000.
We have considered the testimony of respondent's expert witness along with the documentary evidence introduced to support his conclusion. In our view, this witness did not give adequate consideration to the duties performed by Mr. Crane in addition to those duties customarily associated with the position of president and general manager of a company such as White Trucking. We have taken into consideration the fact that Mr. Crane possesses considerable knowledge and expertise with respect to the trucking industry. He has devoted his adult life to this field, having approximately 35 years of experience, and has turned a corporation possessing only an ICC operating certificate into a successful business. The year 1970 was an unusual one for the company, with an increase of 47 percent in operating revenue. This increase was due at least in part to Mr. Crane's efforts. Mr. Crane worked 65 to 70 hours a week in performing his duties for White Trucking.Other than the work done by Mrs. Crane, Mr. Crane had little assistance in performing administrative, sales and office work of White Trucking. However, we have also taken into consideration that Mr. Crane's compensation was determined by his own computations, along with the aid of his wife, of what amount he had been worth to the company and what amount the company could afford to pay. This determination was not the result of arm's length negotiation. Also, we are cognizant of the fact that no dividends were paid by White Trucking in 1970 or prior years. It is petitioner's position that it should be allowed the deduction based upon the fact that, because of the functions Mr. Crane performed for the company, Mr. Crane should be paid the cumulative salary of at least three individuals employed on a full-time basis. This assumption formed the basis of the determination of the amount of the bonus. Several witnesses testified that the company by which they were employed had several full-time employees performing the functions performed by Mr. Crane alone for White Trucking. These witnesses testified that they employed from 5 to 9 people to perform the tasks performed by Mr. Crane and that each of these individuals often worked a 10 to 12-hour day in performing their respective jobs. While it is true that Mr. Crane performed multiple tasks for White Trucking, it does not follow that he performed those tasks in the same manner or to the same extent as several individuals working in a full-time position and in some instances working a 10 or 12-hour day. It is not realistic to assume that someone who has available only a small portion of his time for a particular job would perform the same scope of activities within that particular job as an individual who worked a 10 to 12-hour day at only the one job, assuming that the latter individual was a competent employee. Mr. Crane estimated that in 1970 his working time was spent 25 percent in performing functions as president and general manager of White Trucking, 35 percent in sales work, and 40 percent in functions of a traffic manager. The record shows that Mrs. Crane did some work in all the areas in which Mr. Crane worked, with the possible exception of sales. We have considered all the evidence of record in this case, including both the oral testimony and documentary evidence. The evidence is reasonably clear that had Mr. Crane worked a 40-hour week only as the chief executive officer of White Trucking, he would have as a supervisor done some of the work he did in other capacities for White Trucking. The record is also reasonably clear that compensation of $40,000 a year for this work would have been on the high side as compared to the compensation paid by other companies engaged in the trucking business to their chief executive officers. However, we cannot ignore the fact that Mr. Crane did work from 65 to 70 hours a week and did work for White Trucking which generally was done by other employees of trucking companies. The record is not clear as to the reasonable value of the services performed by Mr. Crane in addition to those normally performed by a chief executive officer. The record is sufficient to show that Mr. Crane was entitled to some compensation for the extra services he performed for White Trucking which required more working hours than would have been required had there been other employees assisting Mr. Crane in this work. Having considered all the evidence of record we conclude that reasonable compensation for Mr. Crane for the year 1970 is $62,000. Petitioner has also argued that Mr. Crane was paid a portion of the amount of the bonus in recognition of the fact that he had been paid a low salary during the years the company was growing. Petitioner argues that, in effect, Mr. Crane was being paid an additional amount in 1970 to catch up for lower amounts paid in other years. Although the shareholders had agreed that Mr. Crane would be paid more as the company could pay additional compensation, there is no evidence in this record to indicate that any of the amount paid to Mr. Crane in 1970 was to compensate him for low salaries in prior years. The way Mr. and Mrs. Crane figured Mr. Crane's salary for 1970 indicates that none of that salary was compensation for prior years. Mr. Crane's salary for the 4-1/2 years prior to the year in issue averaged approximately $25,000 at a time when operating revenues of White Trucking were substantially lower than during 1970. Without further evidence, we conclude that Mr. Crane's salary in prior years was adequate and none of the amount paid to him in 1970 was to compensate him for an inadequate salary in a prior year.
[8]
[1] 93,985
11.95%
9. V.T.C.A., Family Code sec. 5.22 provides: Sec. 5.22. Community Property: General Rules (a) During marriage, each spouse has the sole management, control, and disposition of the community property that he or she would have owned if single, including but not limited to: (1) personal earnings; (2) revenue from separate property; (3) recoveries for personal injuries; and (4) the increase and mutations of, and the revenue from, all property subject to his or her sole management, control, and disposition. (b) If community property subject to the sole management, control, and disposition of one spouse is mixed or combined with community property subject to the sole management, control, and disposition of the other spouse, then the mixed or combined community property is subject to the joint management, control, and disposition of the spouses, unless the spouses provide otherwise by power of attorney in writing or other agreement.↩
10. White Trucking withheld the Federal income tax, Social Security tax and other payroll deductions for Mrs. Crane based upon the amount of $4,000.↩
11. Petitioners have relied on Paul J. Devine,T.C. Memo. 1976-8. This case is distinguishable on its facts. In the Devine↩ case, the sole issue with respect to an apartment-office expense was one of substantiation to determine whether petitioner was entitled to a deduction in an amount in excess of that allowed by respondent.
12. Petitioners rely on our holding in Stephen A. Bodzin,60 T.C. 820 (1973). Our holding was reversed by the Fourth Circuit (509 F.2d 679 (1975)) and in Joel A. Sharon,66 T.C. 515 (1976), we specifically stated (at p. 525) that we will no longer follow our opinion in Bodzin↩.