HENDRICKS FURNITURE, INC. Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hendricks Furniture, Inc. v. Commissioner
Docket No. 34750-84.
United States Tax Court
T.C. Memo 1988-133; 1988 Tax Ct. Memo LEXIS 161; 55 T.C.M. (CCH) 497; T.C.M. (RIA) 88133; March 28, 1988; As amended March 28, 1988 G. Gray Wilson, James M. Iseman, Jr. for the petitioner. James E. Gray, for the respondent. HAMBLEN
MEMORANDUM FINDINGS OF FACT AND OPINION HAMBLEN, Judge: Respondent determined deficiencies in petitioner's Federal income taxes as follows: Taxable Year Ended
Deficiency
May 31, 1979
$ 90,724
May 31, 1980
76,229
May 31, 1981
76,200
The primary issue for determination is the amount that petitioner is entitled to deduct under section 162(a) (1)[1] in each of these three taxable years as reasonable compensation paid to its president, Clyde Hendricks ("Hendricks"), and its vice president, Ronald Brown ("Brown"). [2]
*163 FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts is incorporated herein by this reference. Hendricks Furniture, Inc. ("HFI" or "the corporation" or "petitioner") has its principal place of business in Mocksville, North Carolina. The corporation is an accrual basis taxpayer which timely filed its United States Corporate Income Tax Returns (Forms 1120) for the fiscal years ended May 31, 1979, May 31, 1980, and May 31, 1981, with the Internal Revenue Service Center in Memphis, Tennessee. For purposes of this opinion, each of the fiscal years will be referenced by the calendar year in which it ended. HFI was incorporated under the laws of North Carolina on June 17, 1966, and sells at retail household and office furniture. The competitive market within which HFI operates is one of the world's largest. North Carolina is a unique state for retail furniture as many American furniture manufacturers are based there. Consequently, North Carolina has become a center for the retail sale of furniture. One of its major thoroughfares, I-40, on which Mocksville borders, has been dubbed "Furniture Highway." HFI's reputation *164 in the retail furniture business is excellent. The corporation sells its furniture at a discount of 40 percent off the regular retail price. The furniture lines it offers consist of moderate to high quality brands and include Drexel, Heritage, Thomasville, Pennsylvania House, Henkel Harris, Broyhill, La-z-Boy, and Brown Jordan. Of all HFI's yearly customer orders, approximately twenty-five percent represent telephone orders and about fifty percent represent sales to customers living outside of North Carolina. In generating these sales, petitioner neither has many merchandise returns nor relies heavily on advertising or the use of a toll free number for out-of-state customers. [3] Most of its sales result from word of mouth. HFI delivers most of its sales on its own trucks and follows a practice called "deluxing." Deluxing involves the unpacking of furniture upon its receipt from the manufacturer and inspecting it for damage. Undamaged goods are then *165 blanket-wrapped and delivered to the customer. While some furniture retailers also use their own trucks for delivery, others deliver by common carrier, shipping the furniture in the manufacturer's carton without first inspecting the furniture for damage. In forming HFI, Hendricks and his wife, Helen, made a capital contribution of $ 25,000 to the corporation in exchange for all 1,000 shares of its stock. Hendricks received 900 shares, his wife received 100 shares. These individuals' stock ownership has remained the same to the date of trial, and no other shares of stock have been issued. As additional capital, HFI also borrowed $ 25,000 from the Bank of Davie. This amount was repaid within a year to a year and a half. Other than this initial loan, HFI has not borrowed any other money. [4]
When HFI was founded, its board of directors and officers consisted of Hendricks, president and chief executive officer, Larry Hendricks, [5] vice president, and Helen Hendricks, [6] secretary and treasurer. Larry Hendricks resigned as a director and vice president in 1974. On May 31, 1974, Hendricks' *166 son-in-law, was elected as vice president and as a director for the corporation's fiscal year beginning June 1, 1974. Since that change, HFI's officers and members of its board of directors have remained the same. Petitioner's sales and net profit [7] for the period 1967 through 1981 [8] are as follows: [9]
Year
Sales
Net Profit
1967
$   209,591
$  10,080
1968
282,439
28,215
1969
437,389
43,711
1970
764,188
56,615
1971
981,502
112,676
1972
1,278,082
154,948
1973
1,413,419
226,336
1974
1,927,909
322,299
1975
1,844,881
274,554
1976
2,063,966
304,102
1977
2,429,924
296,271
1978
2,933,021
404,465
1979
3,606,048
490,909
1980
4,160,074
540,762
1981
4,114,729
507,242
*167 Assets
Stockholders'
Net Income
Year
(at book value)
Equity
Before Taxes
1967
$    60,559
$  10,644
$     881
1968
73,043
17,883
9,815
1969
119,152
32,530
20,211
1970
131,230
50,422
25,165
1971
262,289
72,490
31,916
1972
324,472
87,712
28,692
1973
394,297
108,619
48,896
1974
507,375
162,541
117,149
1975
479,536
203,890
85,502
1976
547,192
251,990
94,302
1977
602,880
287,310
60,570
1978
852,118
317,189
64,165
1979
972,249
345,118
58,609
1980
1,044,888
404,051
108,462
1981
1,096,957
451,820
78,942
Hendricks was born on March 24, 1926, in Mocksville, North Carolina. When Hendricks was three years old, his father died. Hendricks attended Mocksville public schools through the eighth grade. When he was 16 years old, Hendricks began working for Davie Furniture Company, a small locally owned furniture retail business in Mocksville. Hendricks worked for this company for the 14-year period from 1942 to 1956. Hendricks' duties at Davie Furniture included selling furniture and appliances, making deliveries, unloading furniture for storage, arranging furniture for display on the showroom floor, *168 and performing any other tasks asked of him. In 1956, Hendricks and another former employee of Davie Furniture, Bill Merrell, entered into a partnership to operate Hendricks and Merrell Furniture in Mocksville. The partnership lasted for eight years, at the end of which time Merrell purchased Hendricks' interest in the business. Sometime after Hendricks' departure, this furniture and appliance company went bankrupt. After leaving Hendricks and Merrell Furniture, Hendricks invested $ 16,000 in an unsuccessful attempt to become a manufacturer of upholstered furniture. Following this unsuccessful effort, Hendricks formed HFI in 1966. He drew the plans and served as general contractor for a 5,000 square foot building which was used as petitioner's initial place of business. Construction of the building was financed with the $ 25,000 which Hendricks and his wife had contributed to HFI's capital and with the $ 25,000 borrowed from the Bank of Davie. Following construction of the building, the corporation began its operations. In 1968, a 5,000 square foot addition to HFI's place of business was constructed at a cost of over $ 60,000. In 1970, a two-story, 5,000 square foot *169 warehouse was built at a cost of over $ 70,000. In 1972, an additional showroom improvement was made at a cost of over $ 75,000. In 1980 and 1981, two warehouses were completed at a total cost of over $ 200,000. Hendricks drew the plans and served as general contractor for each of these structural improvements which were financed solely from the corporation's profits. Hendricks, with Brown, shoulders the responsibility for managing HFI's overall operations and fostering its growth and success. Hendricks handles customer complaints, sells furniture, [10] and helps with the arrangement of furniture displays and with the daily housekeeping of petitioner's business premises. He supervises activities in the corporation's warehouse, checks customers' orders, notes those items that must be delivered, and makes sure that items are properly placed on the corporation's trucks. He oversees the corporation's financial matters and bookkeeping operations, decides when bills should be paid, signs checks, and determines that portion of the corporation's funds which should be placed in long- and short-term certificates of deposit. [11]Hendricks is additionally in charge of the hiring and firing *170 of employees and the handling of employee problems. Tied to his control of employee matters, Hendricks initially establishes the base salary and bonus that each employee is to receive each year. Finally, Hendericks is solely in charge of the corporation's long-range planning. In this capacity, he manages the insuring and expansion of the corporation's physical plant and fleet of delivery trucks. Brown, born on June 24, 1945, attended Mocksville public schools and graduated from Western Carolina University *171 in 1967 with a Bachelor of Science degree in Business Administration. After graduating, Brown served in the United States Army for three years. While in the Army, Brown was commissioned as a second lieutenant in the transportation corps and served as motor officer, supply officer, executive officer, and finally, company commander. Leaving the military, he joined HFI in August of 1970. At HFI, Brown started as a delivery man and a warehouse employee and worked as a salesman on Friday evenings and Saturdays. As time progressed, Brown's responsibilities and experienced increased, and he was made vice president of HFI in June of 1974. As vice president, Brown assists in the managing of HFI and offers his input and advice. Although Brown is "second-in-command," his chief area of expertise is the buying and selling of furniture. [12] He is jointly responsible with Hendricks for merchandising furniture and planning showroom floor displays. Brown has attended numerous manufacturer-sponsored seminars and workshops tied to the merchandising, marketing, and manufacturing of furniture. He also attends semi-annual furniture markets with Hendricks. Brown helps in supervising the corporation's *172 employees, in managing activities in the corporation's bookkeeping department and warehouse, and in handling customers complaints. He additionally has input in the hiring and firing of employees and in determining the size of year-end bonuses. During the years in issue, HFI's operating hours were 9:00 a.m. to 6:00 p.m., Monday through Friday and 9:00 a.m. to 5:00 p.m. on Saturdays. During these years, Hendricks worked Monday to Friday, 8:00 a.m. to 7:00 p.m., and Brown worked from Monday to Saturday with Wednesdays off, 8:00 a.m. to 7:00 p.m. Circumstances sometimes required Hendricks and Brown to work additional hours. In an attempt to keep employee discord to a minimum, HFI does not pay its employees, including officers, on a commission basis. The corporation instead pays cash wages to each employee in the form of a base salary and bonus. No employees have voiced any complaints concerning this payment structure. Base salaries and bonuses are initially determined by Hendricks and are later ratified by HFI's board of directors. In each *173 of the years in issue, bonuses were determined and paid either at the end of HFI's fiscal year or within two and a half months thereafter. No formula is used by Hendricks or the board of directors in determining employee compensation. However, in initially establishing the bonus paid a particular employee, Hendricks considers the yearly profit of the corporation, the amount of time the employee has been with the corporation, the duties of the employee, and the degree of skill and efficiency with which the employee handles his or her position. Hendricks judges an employee's skill and efficiency by observing the employee on a daily basis. Compensation paid by petitioner to Hendricks for the years 1967 through 1981 is as follows: [13]
Cash
Cash
Wages
Wages
as a
Cash Wages
as a
% of
Base
Profit-Sharing
% of
Net
Total
Salary
Bonus
Contribution
Total
Sales
Profit
1967
$  5,200
$    -0-
$   -0- $   5,200
2.5%
52%
1968
5,000
8,000
-0- 13,000
4.6%
46%
1969
6,000
10,000
-0- 16,000
3.7%
37%
1970
9,000
10,000
-0- 19,000
2.5%
34%
1971
21,800
23,200
5,400
50,400
4.6%
40%
1972
37,750
30,000
6,811
74,561
5.3%
44%
1973
48,000
40,000
13,200
101,200
6.2%
39%
1974
60,000
50,000
16,500
126,500
5.7%
34%
1975
60,000
50,000
16,500
126,500
6.0%
40%
1976
65,000
45,000
16,500
126,500
5.3%
36%
1977
76,000
54,000
19,500
149,500
5.3%
44%
1978
72,000
125,000
29,550
226,550
6.7%
49%
1979
72,000
200,000
40,800
312,800
7.5%
55%
1980
72,000
200,000
40,800
312,800
6.5%
50%
1981
72,000
200,000
40,800
312,800
6.6%
54%
*174 For the years 1967 to 1981, base salary averaged approximately 48 percent of Hendrick's cash wages, and his total cash compensation averaged 5.3 percent of HFI's sales and 44 percent of HFI's net profit. For the years 1979 to 1981, base salary averaged approximately 25 percent of Hendrick's cash wages, and his total cash compensation averaged 6.9 percent of HFI's sales and 53 percent of HFI's net profit. Compensation paid by petitioner to Brown for the years 1971 through 1981 is as follows: Cash
Cash
Wages
Wages
as a
Cash Wages
as a
% of
Base
Profit-Sharing
% of
Net
Total
Salary
Bonue
Contribution
Total
Sales
Profit
1971
$  5,100
$  2,500
$ 1,140
$   8,740
1972
6,000
10,000
1,272
17,272
1973
9,600
15,000
3,690
28,290
1974 [14]
13,000
18,000
4,650
35,650
1.6%
10%
1975
18,000
19,000
5,550
42,550
2.0%
13%
1976
18,000
44,000
9,300
71,300
3.0%
20%
1977
28,000
40,000
10,200
78,200
2.8%
23%
1978
30,000
55,000
12,750
97,750
2.9%
21%
1979
30,000
60,000
13,500
103,500
2.5%
18%
1980
30,000
60,000
13,500
103,500
2.2%
17%
1981
30,000
60,000
13,500
103,500
2.2%
18%
*175 Besides Hendricks, Brown, and Larry Hendricks, the corporation had added other employees as needed and as financially expedient and had kept its employee turnover at a very low level. Hendricks had also earned the respect of these added employees. Compensation paid by petitioner to these added employees for the years 1967 through 1981 is as follows: Cash Wages
Base
Profit-Sharing
Year
Salary
Bonus
Contribution
Total
1967
$   1,118
$    -0-
$    -0-
$   1,118
1968
1,569
-0-
-0-
1,569
1969
5,916
-0-
-0-
5,916
1970
11,094
-0-
-0-
11,094
1971
15,177
-0-
2,640
17,817
1972
19,750
3,000
2,362
25,112
1973
30,711
6,000
3,270
39,981
1974
46,684
9,000
4,200
59,884
1975
65,213
11,500
4,770
81,483
1976
69,250
33,300
15,367
117,918
1977
88,549
30,000
14,791
133,340
1978
94,075
54,000
21,300
169,375
1979
121,250
55,000
24,300
200,550
1980
136,400
58,000
28,980
223,380
1981
139,300
55,000
28,035
222,335
During the years 1967 to 1981, base salary averaged approximately 84 percent of the *176 total cash compensation paid petitioner's employees other than Hendricks, Brown, and Larry Hendricks. For the years 1979 to 1981, base salary averaged approximately 70 percent of total cash compensation paid to HFI's employees other than Hendricks and Brown. Starting in 1972 and continuing through 1981, petitioner consistently paid dividends to its shareholders. These dividends payments were authorized each year by HFI's board of directors and are listed as follows: Year
Dividend
1972
5,000
1973
10,000
1974
10,000
1975
10,000
1976
12,000
1977
8,000
1978
16,000
1979
16,000
1980
16,000
1981
12,000
HFI's total dividend payments equaled approximately 4.5 times its shareholders' initial dollar investment in the corporation. HFI's shareholders have seen the corporation's plant and equipment expand without the corporation's having to borrow on a long-term basis or to turn to its shareholders for additional injections of capital. For each year during the corporation's lifetime, its shareholders have additionally seen each dollar's worth of stockholders' equity generate, on the average, $ 12.13 in sales and $ 1.41 in net profit. For 1979, 1980, and *177 1981, a dollar of stockholder's equity generated between $ 9.11 and $ 10.45 of sales and between $ 1.12 and z 1.42 of net profit. Robert Morris Associates ("RMA") conducted a study focusing on furniture retailers with average sales of $ 4.565 million and covering the period from June of 1980 through March of 1981. A comparison between HFI's 1981 performance and the results of the RMA study follows. In 1981, petitioner's accounts receivable represented only .5 percent of the corporation's total assets. [15] In contrast, the average accounts receivable amount for firms included in the RMA study represented 29.2 percent of these companies' total assets. HFI held approximately 41 percent of its total assets in cash or cash equivalents while the median under the study was 4.8 percent. HFI's ratio off cost of goods sold to ending inventory approached 9.4 to 1 and exceeded the RMA median ratio of 2.6 to 1 by more than three times. Petitioner's closing inventory represented only 32 percent of its total asset value compared to 42.3 percent in the RMA sample. HFI's operating expenses, including total payroll expenses, consumed 18.8 percent of the corporation's revenue while the RMA study *178 median was 38.5 percent. Finally, HFI had no long-term debt. In contrast, those firms included in the RMA study had, on the average, long-term debt equal to 11.9 percent of their total assets and an additional three percent of currently maturing long-term debt. For 1980 and 1981, the National Home Furnishings Association ("NHFA") also collected data specifically tied to furniture retailers. This data concentrated on retailers from various geographic regions in the country and of varying sizes based on sales figures. The data included industry averages and listed distinctions between high-and low-profit companies. For 1980, high-profit firms in the NHFA study had an average ratio of sales to total assets equal to 2 to 1. HFI's ratio of sales to total assets approached 4 to 1 in 1980 and equalled 3.75 to 1 in 1981. For 1980, high-profit firms in the NHFA study produced $ *179 47.76 of revenue per square foot of building space and $ 86,451 of revenue per full-time employee equivalent. In comparison, HFI generated sales of $ 208 per square foot of building space and approximately $ 300,000 of revenue per employee. [16] In 1981, NHFA reported that its high-profit segment of firms spent 17.7 percent of their revenues on payroll in contrast to HFI's 13.5 percent. OPINION Section 162(a) (1) provides that a company, in computing its taxable income, is allowed a deduction for all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on its trade or business, including "a reasonable allowance for salaries or other compensation for personal services actually rendered." To qualify under section 162(a) *180 (1), compensation must be both reasonable in amount and paid purely for services. Sec. 1.162-7(a), Income Tax Regs. This test is characterized as having two prongs, the second of which requires proof of "compensating purpose." See Elliotts, Inc. v. Commissioner,716 F.2d 1241, 1243 (9th Cir. 1983), revg. on another issue and remanding a Memorandum Opinion of this Court. Because of the subjective nature of determining whether compensation was paid purely for services, courts generally focus on the reasonableness prong. Elliotts, Inc. v. Commissioner,716 F.2d at 1243. The question whether compensation is reasonable is a question to be resolved on the basis of an examination of all the facts and circumstances of a case. Charles Schneider & Co. v. Commissioner,500 F.2d 148, 151 (8th Cir. 1974), affg. a Memorandum Opinion of this Court, cert. denied 420 U.S. 908 (1975); Pacific Grains, Inc. v. Commissioner,399 F.2d 603, 605 (9th Cir. 1968), affg. a Memorandum Opinion of this *181 Court. Perlmutter v. Commissioner,44 T.C. 382, 401 (1965), affd. 373 F.2d 45 (10th Cir. 1967). The determination of the Commissioner is presumptively correct, and the burden of proving the reasonableness of compensation is upon petitioner. Botany Worsted Mills v. United States,278 U.S. 282 (1929); Rule 142(a). If petitioner successfully proves error, the Court must then determine the amount of reasonable compensation. Pepsi-Cola Bottling Co. of Salina, Inc. v. Commissioner,61 T.C. 564, 568 (1974), affd. 528 F.2d 176 (10th Cir. 1975). Although there is no definite formula by which the reasonableness of compensation can be determined in any particular instance, Irby Construction Co. v. United States,290 F.2d 824, 826 (Ct. Cl. 1961), we can look to a number of factors. [17] These factors include the following: the employee's qualifications; the nature, extent and scope of the employee's work; the size and complexities of the business; a comparison of salaries paid with the gross income *182 and the net income; the prevailing general economic conditions; comparison of salaries with distributions to stockholders; the prevailing rates of compensation for comparable positions in comparable concerns; the salary policy of the taxpayer as to all employees; and in the case of small corporations with a limited number of officers the amount of compensation paid to the particular employee in previous years. * * * [Home Interiors & Gifts, Inc. v. Commissioner,73 T.C. 1142, 1155-1156, (1980), quoting Mayson Mfg. Co. v. Commissioner,178 F.2d 115, 119 (6th Cir. 1949), remanding a Memorandum Opinion of this Court.] *183 Of these factors, no single one is dispositive; instead, our determination must be based upon a careful consideration of all factors in light of the relevant facts and circumstances. See Mayson Mfg. Co. v. Commissioner, supra.
Furthermore, the test of reasonableness must not be applied to a company's officers as a group but rather to each officer's compensation in light of the individual services performed. L. Schepp Co. v. Commissioner,25 B.T.A. 419 (1932). And where the employees to whom the compensation is paid are also in control of the corporation, the relevant facts must be more closely scrutinized.[18]Charles Schneider & Co. v. Commissioner,500 F.2d 148, 152 (8th Cir. 1974), affg. a Memorandum Opinion of this Court; see also Home Interiors & Gifts, Inc. v. Commissioner,73 T.C. at 1156 (1980); Dielectric Materials Co. v. Commissioner,57 T.C. 587, 591 (1972). *184 In applying the foregoing guidelines to the facts before us, we will specifically refer only to those factors upon which we placed the greatest reliance, although we have carefully considered all [Text Deleted by Court Emendation] relevant criteria in reaching our conclusion. Both respondent and petitioner relied on expert witnesses to establish prevailing rates of compensation for comparable positions in comparable concerns. [19] We do not, however, fully rely on the testimony or reports of either expert witness. Respondent's expert witness testified that in his opinion, a reasonable compensation amount for Hendrick's services would be $ 120,000 in 1979, $ 127,000 in 1980, and $ 135,000 in 1981 and that a reasonable compensation amount for Brown's services would be $ 60,000 in 1979, $ 63,500 in 1980, and $ 67,500 in 1981. In reaching his conclusions, respondent's expert *185 relied on a number of comparative tables. One table, however, rested on a sample of such small size that is hardly representative for purposes of comparison. This first table and a second table also rested on collected survey data for firms which were not particularly comparable with petitioner in either size, profitability, or line of business. [20] A third table, based on RMA data, listed officer compensation as a percentage of sales. Though this table is enlightening, its raw numerical data fails to take into consideration HFI's habit of out-performing firms included in the RMA and NHFA studies. [21]
Petitioner's expert witness examined studies generated by RMA and NHFA and studies whose data *186 was not shown to be tied to the retail furniture business. Using these studies, this expert then summarized his results using charts. One chart focused on base salaries paid executive officers; another focused on total salary costs for a management firm composed of a chief executive officer, an executive vice president, an administrative manager, and a warehouse manager. A final chart ["the bonus chart"] utilized linear regression to justify the total bonuses petitioner paid its officers. The results of this linear regression demonstrated high correlations between the corporation's sales and the total officer bonuses it paid and between the corporation's net profit and the total officer bonuses it paid. In placing slight emphasis on the first two charts of petitioner's expert witness, we note that these charts reflect information tied to businesses which are not necessarily comparable to HFI. [22] Furthermore, because the bonus chart focuses on the total bonuses paid to petitioner's officers, it fails to follow the rule of L. Schepp Co. v. Commissioner,25 B.T.A. at 419, that the test of reasonableness must be applied to compensation paid a company's officers *187 on an individual, as opposed to a group, basis. By resting on petitioner's own sales, net profit, and bonus payment figures, this bonus chart also merely substantiates the corporation's practice of paying high bonuses when sales and net profits are high. Such substantiation, however, does not lead to a conclusion that the resulting bonus amounts are reasonable. Finally, we point out that petitioner's expert failed to fully consider the ease with which Hendricks, in initially establishing the cash wages of HFI's employees and officers, could determine the designation of those amounts labelled "base salaries" and those labelled "bonuses." Without having sufficient comparable compensation data in the record on which we can fully rely, we find that we must place greater emphasis on those other factors in Home Interiors & Gifts, Inc. v. Commissioner. In considering these other factors, we agree that petitioner has shown that respondent's determinations are erroneous. The need to determine reasonable compensation amounts for the services rendered by each of petitioner's officers then rests with us. *188 Pepsi Cola Bottling Co. of Salina, Inc. v. Commissioner,61 T.C. at 568. We note that an employee's superior qualifications may justify a high level of compensation. See, e.g., Home Interiors & Gifts, Inc. v. Commissioner,73 T.C. at 1158; Capitol Market, Ltd. v. United State,207 F. Supp. 376, 378-379 (D. Hawaii 1962). In his brief, respondent concedes that Hendricks and Brown are well qualified for and experienced in the performance of their duties at HFI. We fully agree with this concession. By 1979, Hendricks had been in the retail furniture business for well over 35 years. Over these years Hendricks had become completely familiar with all respects of furniture retailing. He had begun as a 16-year old selling furniture, making deliveries, unloading furniture for storage, and arranging furniture displays and had later advanced to the level of a corporate officer overseeing the success and future expansion of his own furniture company. By 1979, Brown had been in the retail furniture business for a number of years and also had learned the details of furniture retailing under Hendrick's tutelage. In providing his services *189 to HFI, Hendricks was deeply involved and oversaw all details of the corporation's day-to-day operations. His daily interests were consumed in the particularities and happenings of the corporation's warehouses, its showroom, its bookkeeping and financial operations, its employee policies, and its relations with customers and suppliers. Moreover, Hendricks single-handedly chartered the corporation's plans for future expansion. In this regard, we find it particularly noteworthy that a man with only an eighth-grade education was responsible for the architectural designing and contracting of approximately a half million dollars worth of capital improvements to HFI's physical plant. Of this half million dollar figure, $ 200,000 reflected the cost of warehouses built in 1980 and 1981. We find that Brown was likewise involved in most details of HFI's business. His greatest influence was in the area of sales and merchandising, and he and Hendricks were directly involved in nearly half of HFI's sales during the years in issue. Furthermore, though many final decisions tied to the corporation's operations rested in Hendricks' hands, Brown was a constant source of input. [23]
*190 In examining petitioner's size and performance, we observe that the corporation has done exceedingly well in a competitive business. HFI has reduced its exposure to nonpaying customer accounts by keeping its accounts receivable at an extremely low level. HFI also carries much of its assets' value in highly liquid cash and cash equivalents. The consequences of its reduced exposure to customer delinquency and its holding highly liquid assets are that the corporation generates a very reliable source of interest income, it insures the integrity of its assets' values by keeping a high portion of these assets in forms which retain their fair market values, and it is able to respond quickly to market changes. HFI's high ratio of cost of goods sold to ending inventory, an indicator of inventory turnover, suggests that the corporation is very good at moving its product. The corporation's comparatively low percentage of ending inventory to total assets also reaffirms this suggestion. Additionally, this comparatively low percentage supports the corporation's strategy of keeping a greater portion of its assets' value in forms which more readily retain their fair market values. HFI *191 has kept its operating expenses at a belt-tightening level in comparison to firms in the RMA and NHFA studies. A portion of this lower level is traceable to HFI's reduced payments for advertising and interest and its comparatively lower total payroll expenses. Petitioner's lower operating expenses are also traceable to HFI's efficient use of resources. HFI's high ratio of sales to total assets represents this corporation's ability to squeeze a high sales volume from each dollar's worth of its assets. This ability is also reflected in HFI's high level of sales per square foot of building space, an indicator of the corporation's efficient use of this fixed asset. Moreover, HFI efficiently used its labor; this is reflected in the corporation's high level of sales per employee. [24]
In continuing our examination of HFI's size and performance, we note that over its lifetime the corporation has experienced tremendous growth in the book *192 value of its assets, its sales, its net profit, and its net income before taxes. A comparison of the year 1967, the first full year of petitioner's operation, to 1981, the last year for which data is available, reveals that the book value of the petitioner's assets increased by more than 1710 percent during this fifteen-year period, its sales increased by more than 1860 percent, its net profit increased by over 4930 percent, and its net income before taxes increased by over 8860 percent. [25] During the shorter period from 1978 to 1981, HFI steadily increased the book value of its assets, generated increasing sales and net profit in two of the three earning periods, and earned its second and fifth highest levels of net income before taxes. *193 Petitioner's history of paying dividends and the yearly return on its stockholders' equity in the form of sales and net profit are factors we additionally acknowledge. With regard to the payment of dividends, we note the guidance offered by the Supreme Court in United States v. Byrum,408 U.S. 125 (1972). There the Supreme Court stated, "Directors of a closely held, small corporation must bear in mind the relatively limited access of such an enterprise to capital markets. This may require [consequently] a more conservative policy with respect to dividends than would be expected of an established corporation with securities listed on national exchanges." United States v. Byrum,408 U.S. at 140. We find respondent's argument that HFI paid only "nominal" dividends to be unpersuasive. In sum, we have before us a successful enterprise that is the progeny of Hendricks. He is the architect, engineer, general manager and administrator of this business, and his ideas, efforts, moxie and know-how have nursed it from its infancy. This required assiduous application and financial sacrifice in the beginning, for which, as he wore two hats as a shareholder *194 and manager, he has earned a joint and appropriate award -- the return on the original investment through increased dividends and unrealized capital appreciation together with compensation for his entrepreneurial and management skills and efforts -- in short what the competitive enterprise system is all about. For example, the company now (in the final year before us) is worth 20 times the original investment and cash dividends in the final year before us amount to one-half the original investment. It takes outstanding management to achieve such results, and outstanding management is entitled to appropriate remuneration for such performance. As to the son-in-law, we find the same factors applicable to him. Hendricks brought him into the business. He started at the bottom so that he could learn all phases and aspects of the business, but he had the talent and application to climb the corporate ladder. He, too, has earned his way and his entitlement to be compensated appropriately for his contributions. While we find that these officers have earned substantial compensation emoluments for the years before us, we, nevertheless, must determine what is appropriate under the *195 circumstances. Accordingly, we look to the statistics in the record to ascertain an appropriate award for these high performing executives. We also take cognizance of HFI's previous payments of cash wages to Hendricks and Brown and the historic relationships between these payments and the corporation's yearly sales and net profit. [26]
Based on all evidence, we hold that a reasonable cash compensation amount for Brown was $ 86,500 in 1979 and that he was paid reasonable cash compensation amounts in 1980 and 1981. Based on all evidence, *196 we hold that reasonable cash compensation amounts of Hendricks were $ 205,000 in 1979, $ 230,000 in 1980, and $ 221,000 in 1981. For 1979 through 1981, reasonable yearly contributions on behalf of Hendricks and Brown to petitioner's pension and profit sharing plan would equal 15 percent of each officer's reasonable yearly cash compensation. [27]
Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the taxable years in issue. All rule references are to the Court Rules of Practice and Procedure. ↩
2. Respondent determined that petitioner had paid its president and vice president excessive amounts of cash compensation in the combined amounts of $ 171,636, $ 143, 148, and $ 148,034 for petitioner's taxable years ending respectively on May 31, 1979, May 31, 1980, and May 31, 1981. During these three taxable years, petitioner also contributed amounts to a pension and profit sharing plan benefiting its president and vice president; petitioner's contributions equaled fifteen percent of these two officers' total compensation. Because respondent determined that petitioner had paid excessive amounts of cash compensation to its two officers, he similarly disallowed deductions claimed by petitioner and tied to its pension and profit sharing plan contributions. See sec. 404(a) (3) (A). The disallowed contribution amounts equaled 15 percent of each taxable year's determined excessive payment of compensation or $ 25,745 for 1979, $ 21,472 for 1980, and $ 22,205 for 1981. Finally, the above adjustments had the effect of increasing petitioner's taxable income for the years in issue. Because of these higher taxable income figures, respondent adjusted the amounts that petitioner could claim as charitable deductions for the years in issue. See sec. 170(b) (2). These adjustments resulted in the decreasing of petitioner's taxable income in the amount of $ 1,096 for its taxable year ended in 1979 and $ 857 for its taxable year ended in 1981 and the increasing of petitioner's taxable income in the amount for $ 1,096 for its taxable year ended in 1980. Our final determination in this case will affect the propriety of all these adjustments. Consequently, a Rule 155 Computation will be required. ↩
3. Petitioner's advertising expenses totalled $ 2,927 in 1979, $ 4,556 in 1980, and $ 4,983 in 1981. In contrast, one furniture dealer who advertised and used a toll free number spent upwards of $ 250,000 for these services. ↩
4. Because HFI had not borrowed any money, it paid no amounts in interest during the years in issue. ↩
5. Larry Hendricks was Hendricks' son and one of the incorporators of HFI. ↩
6. Helen Hendricks at no time has taken an active role in the conduct of the corporation's business. She has not received a salary. She has not participated in the management of the corporation's business, other than by giving her approval as a director to management decisions made by her husband and son or son-in-law. ↩
7. As used in this opinion, "net profit" represents petitioner's pre-tax profits prior to reduction by dividends paid and by compensation paid to Hendricks, Brown, and Larry Hendricks. ↩
8. The period from 1967 to 1981 has been marked by incessant inflationary pressures. These pressures reduced the value of a dollar so that a consumer dollar spent in 1981 purchased 36.7 percent of that which a consumer dollar spent in 1967 would purchase. United States Bureau of the Census, Statistical Abstract of the United States: 1987,↩ Table No. 763 (107 ed. 1986). 9. All dollar amounts appearing in charts throughout this opinion have been rounded to the nearest dollar. ↩
10. Hendricks was personally involved in the sales of approximately one million dollars worth of furniture during each of the years in issue. ↩
11. In 1981, petitioner held $ 507,533 in certificates of deposit, an amount which represented 62 percent of its total current assets. In 1980, petitioner held $ 429,362 in certificates of deposit, an amount equal to 46 percent of its total current assets. And in 1979, petitioner's certificates of deposit totalled $ 410,559, an amount equal to 49 percent of its total current assets. HFI also generated interest income during these three years. Its interest income amounted to $ 63,352 in 1981, $ 67,617 in 1980, and $ 27,792 in 1979. ↩
12. Brown was directly involved in the selling of a approximately one million dollars worth of furniture in each of the years in issue. ↩
13. HFI also made contributions to a pension plan during the corporation's history. ↩
14. In 1974, Brown replaced Larry Hendricks as vice president of HFI. ↩
15. Petitioner held $ 5,654 in accounts receivable and had $ 1,096,956 in total assets in 1981. In 1980, petitioner held $ 2,696 in accounts receivable and had $ 1,044,888 in total assets. Finally, petitioner's accounts receivable amounted to $ 9,068 and its total assets equalled $ 972,249 in 1979. ↩
16. HFI generated sales in the Drexel line of furniture in the amount of $ 250 per square foot of showroom space. In comparison, other North Carolina Drexel dealers averaged $ 150 per square foot in sales of this furniture line, and the national average for this same line as reported by the NHFA was approximately $ 75 per square foot. ↩
17. In examining the payment of fiscal year-end bonuses to petitioner's officers, we note sec. 1.162-7 (b) (2), Income Tax Reg., which provides: The form or method of fixing compensation is not decisive as to deductibility. While any form of contingent compensation invites scrutiny as a possible distribution of earnings of the enterprise, it does not follow that payments on a contingent basis are to be treated fundamentally on any basis different from that applying to compensation at a flat rate. * * *↩
18. Though Brown owns no stock in HFI, he, nevertheless, exercises a position of control within the corporation. During the years in issue, he served as both an officer in the corporation and a member of its board of directors. Additionally, his close relation to Hendricks is something we must consider. These facts compel our conclusion that we must subject Brown's compensation to the same close scrutiny that we direct towards that of Hendricks. See Charles Schneider & Co. v. Commissioner,500 F.2d 148, 153↩ (8th Cir. 1974), affg. a Memorandum Opinion of this Court. 19. Sec. 1.162(b) (3), Income Tax Regs., pertinently provides, "It is, in general, just to assume that reasonable and true compensation is only such amount as would ordinarily be paid for like services by like enterprises under like↩ circumstances." (Emphasis added.) 20. See Demian, Ltd. v. Commissioner,T.C. Memo. 1983-683↩. 21. Additionally, while respondent's expert presented little information on what were the exact duties of chief executive officers of the companies to which he compared petitioner, we found no indication that any of these other officers designed and oversaw the construction of their companies' offices and warehouses and dealt with the corporate minutiae with which Hendricks and Brown were daily concerned. ↩
22. See Demian, Ltd. v. Commissioner,T.C. Memo. 1983-683↩. 23. At this point, we mention a debate waged between petitioner and respondent in their respective briefs. Petitioner contended that Hendricks and Brown shared the duties of chief executive officer, executive vice president, administrative manager in charge of bookkeeping, and warehouse manager. This contention we accept. Based on this contention, petitioner then argued that we should compare the total compensation HFI paid Hendricks and Brown during each of the years in issue to the total compensation other firms paid four individuals who filled these four different managerial positions. Respondent argued that our decision in C. A. White Trucking Co. Inc. v. Commissoner,T.C. Memo. 1977-6, affd. 601 F.2d 867 (5th Cir. 1979), prevented our accepting petitioner's argument. In this Memorandum Opinion, we stated, While it is true that Mr. Crane performed multiple tasks for White Trucking, it does not follow that he performed those tasks in the same manner or to the same extent as several individuals working in a full-time position and in some instances working a 10 or 12-hour day. It is not realistic to assume that someone who has available only a small portion of his time for a particular job would perform the same scope of activities within that particular job as an individual who worked a 10 to 12-hour day at only the one job, assuming that the latter individual was a competent employee. * * * Though we support this language in C. A. White Trucking Co., we point out that in that case we went on to say, The record is not clear as to the reasonable value of the services performed by Mr. Crane in addition to those normally performed by a chief executive officer. The record is sufficient to show that Mr. Crane was entitled to some compensation for the extra services he performed for White Trucking * * * "[36 T.C.M. 19, 27; 46 P-H Memo T.C. par. 77,006 at 77-27.]
Having pointed out such, we must not ignore the extra services provided by Hendricks and Brown in determining reasonable compensation levels for each. Cf. Elliotts, Inc. v. Commissioner,716 F.2d 1241, 1246 (9th Cir. 1983); Miller Mfg. Co. v. Commissioner,149 F.2d 421, 424↩ (4th Cir. 1945), affg. a Memorandum Opinion of this Court. 24. Petitioner's low employee turnover certainly contributed to this corporation's high level of sales per employee. For creating the accommodating working environment which engendered this low turnover, HFI's officers should be compensated. ↩
25. In constant, 1967 consumer dollars, the book value of HFI's assets increased to $ 402,583 by 1981, its sales increased to $ 1,510,106 by this same year, its net profit increased to $ 186,158, and its net income before taxes increased to $ 28,972. These increases represented respective percentage increases from 1967 to 1981 of 565 percent, 621 percent, 1747 percent, and 3189 percent. These increases in constant dollars are largely the result of the managerial style and successful efforts of HFI's officers. ↩
26. Our applying these historic relationships to HFI's sales and net profit for the three years in issue results in the following: Hendricks
5.3% of Sales
44% of Net Profit
Average
1979
$ 191,121
$ 216,000
$ 203,561
1980
220,484
237,935
229,210
1981
218,081
223,186
220,634
Brown
2.4% of Sales
17.5% of Net Profit
Average
1979
$ 86,545
$ 85,909
$  86,227
1980
99,842
94,633
97,238
1981
98,753
88,767
93,760
These figures represent cash wages for the years in issue based on HFI's past valuation of the services provided by Hendricks and Brown. ↩
27. Because we do not hold solely for respondent in this case, we deny his oral motion to conform his pleadings to the proof. In his opening brief, respondent incorrectly stated that we had granted this motion. ↩